UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAQISHA BOSWELL, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 10480 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ENVOY AIR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Laqisha Boswell brings this *pro se* suit against her former employer, Envoy Air, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1981, alleging that she was denied a promotion and ultimately terminated due to her race and color and in retaliation for complaining about discrimination. Doc. 14. Envoy moves for summary judgment. Doc. 66. The motion is granted.

**Background**

The following facts are set forth as favorably to Boswell, the nonmovant, as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

Envoy hired Boswell, an African-American woman, in January 2015 as a passenger service agent at Chicago O'Hare International Airport. Doc. 82-3 at ¶¶ 1, 3-4. Her responsibilities included interacting with customers at the gate, collecting boarding passes, addressing customer concerns, and moving the jet bridge to meet incoming airplanes. *Id*. at ¶ 4.

Between March 2015 and June 2016, Boswell had twenty documented discussions with her supervisors regarding problems with her job performance. *Id*. at ¶ 34; Doc. 82-6 at 40-61. Those problems included meeting incoming flights late, failing to follow safety procedures, leaving her work area without notifying a supervisor, and failing to timely complete required tasks. Doc. 82-6 at 41-42, 46, 56. Boswell did not receive any formal advisories and was never suspended. Doc. 82-3 at ¶ 14. She did have two positive documented discussions with supervisors, one reflecting that a passenger commended her performance in a social media post and another recognizing her handling of an oversold flight. *Id*. at ¶ 34; Doc. 82-6 at 51, 53.

In July 2015, during her six-month probationary period, Boswell applied for an "acting lead" designation. Doc. 82-3 at ¶¶ 5, 9; Doc. 68-4 at 9. The acting lead designation is not a separate position; rather, it reflects that a passenger service agent is "capable of filling in for the lead agent" when the lead agent is unavailable. Doc. 82-3 at ¶ 6. While filling in for a lead agent, an acting lead earns $1 per hour above her normal hourly wage. *Id*. at ¶ 7.

Upon receiving Boswell's application, Marcus Campbell, a passenger service supervisor, asked Boswell's other managers and supervisors whether they had any concerns with granting her the acting lead designation. *Id*. at ¶ 9. Boswell's direct supervisor, Jon Farabee, responded that she was not ready for the designation, citing several concerns with her performance, including her attitude, argumentative behavior, and difficulty accepting constructive feedback. *Id*. at ¶ 10. Other managers and supervisors agreed with Farabee. *Id*. at ¶ 11. On August 1, 2015, Monica Jazmin, another of Boswell's supervisors, met with her to discuss specific areas in which she needed to improve her job performance—including teamwork, dependability, proactivity, communication, attitude, and awareness of how others perceive her actions and words—before she would be considered for the acting lead designation. *Id*. at ¶ 12.

In January 2016, Boswell had a discussion at a gate with supervisors Rosamund Murray and Francesca Rivera when they stopped by for a uniform check. *Id*. at ¶ 16. Boswell asked Murray and Rivera for "vendors' access" so that she could bring "special dietary liquids" through the airport security checkpoint. *Ibid*. According to Boswell, Murray offered tips on losing weight and said that she would grant the request if Boswell showed that she was serious by actually losing weight, while Rivera offered to make Boswell an acting lead if she tried Rivera's sister's diet plan. *Id*. at ¶ 17. Boswell was offended by Rivera's offer because it had nothing to do with her job performance. *Id*. at ¶ 19. Murray and Rivera deny offering Boswell the acting lead designation if she tried a specific diet plan. *Id*. at ¶ 23.

On January 28, 2016, Boswell sent Ricky Deane, an Envoy vice president, an email with the subject line "Discrimination At The Workplace." *Id*. at ¶ 15; Doc. 68-1 at 107. In the email, Boswell expressed fear that her managers were going to "find a way to terminate [her]." Doc. 68-1 at 107. On February 1, 2016, Boswell emailed a written statement alleging discrimination based on her conversation with Murray and Rivera and the fact that she had not been designated as an acting lead. Doc. 82-3 at ¶ 15; Doc. 68-1 at 108-109. Boswell explained that she believed it was "a form of discrimination" for Envoy to designate workers with less seniority as acting leads while continuing to deny her the designation. Doc. 68-1 at 108-109. Boswell claimed that managers had told her that the acting lead designation required a year of experience, but that she knew of coworkers who had received the designation after less than a year on the job. *Ibid*. Neither email referred to discrimination on account of race, color, or any other protected characteristic. Doc. 82-3 at ¶ 21; Doc. 68-1 at 107-109.

Amy Leonard, an employee in Envoy's human resources department, investigated Boswell's allegations. Doc. 82-3 at ¶ 22. On February 15, 2016, Leonard notified Boswell that

she had completed her investigation and had concluded that Boswell's allegations of discrimination and violations of company policy were not substantiated. *Id*. at ¶ 24; Doc. 68-1 at 111. Boswell disagreed with the result but could not identify any respect in which Leonard's investigation was incomplete. Doc. 82-3 at ¶ 25.

Boswell asserts that "a lot of agents" with less seniority than she, five of whom she was able to identify by name, received the acting lead designation or were promoted to permanent lead. *Id*. at ¶ 64. Two are, like Boswell, African-American. *Id*. at ¶ 65. Boswell does not know whether any of the five agents "had documented discussions regarding performance issues in their files," but she assumes that they did. *Id*. at ¶ 68; Doc. 68-1 at 50. (Boswell's Local Rule 56.1(b)(3)(B) response disputes this fact on the ground that Envoy did not comply with her discovery request "for a record of everyone that was under her hire date." Doc. 82-3 at ¶ 68. Boswell, however, has forfeited any objection based on Allied's failure to produce discovery; the discovery cutoff has long since passed, Boswell never moved under Civil Rule 56(d) to allow her more time to take discovery before responding to the summary judgment motion, and she never moved to compel production of the records in question. *See Trask v. Rodriguez*, 854 F.3d 941, 944 (7th Cir. 2017) ("[The plaintiff] never asked the district court to compel disclosure, so she will not be heard to complain about [the court's] failure to do so."); *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988) (holding that the plaintiff could not assert inadequate discovery as a basis for reversing summary judgment where he failed to ask the district court for more time to conduct discovery). Accordingly, because Envoy's assertion is supported by the cited portions of the record, it is deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").)

On June 7, 2016, Boswell had a verbal altercation outside a gate with Chelsea Pinzon, another Envoy employee. Doc. 82-3 at ¶ 40. Envoy passenger service agents Erika Jose, Evelyn Bonet, and Lawrence Coloma were present. *Ibid*. Early the next morning, Pinzon complained about the incident in an email. *Id*. at ¶ 41; Doc. 68-3 at p. 21. According to Pinzon, she had changed out of her uniform near the end of her shift and was talking with Coloma when Boswell began questioning her lack of a uniform. Doc. 68-3 at p. 21. Pinzon claims that when she explained that she was not required to be in uniform at that time, Boswell "escalated the conversation," "became aggressive," "us[ed] hand motions," and "threaten[ed] [her] with statements like 'You don't know me, I'm not scared to fight a girl[] and get fired.'" *Ibid*. Meanwhile, Boswell called Farabee to complain about the altercation, claiming that Pinzon lost her temper and cursed at her. Doc. 82-3 at ¶ 42. At Farabee's request, Boswell provided a written statement explaining her side of the story. *Id*. at ¶¶ 42, 45; Doc. 68-3 at p. 23.

Danielle Griffin, a field services manager whose duties included investigating employee complaints related to Envoy's Work Environment Policy, investigated the incident. Doc. 82-3 at ¶¶ 43-44. Griffin interviewed Boswell and Pinzon separately. *Id*. at ¶ 43. During her interview, Boswell acknowledged asking Pinzon why she was not in uniform, but said that Pinzon responded by cursing and yelling at her. *Id*. at ¶ 45. Boswell claimed that she remained calm and denied cursing at, making a fist at, or threatening Pinzon. *Ibid*.

Griffin also obtained written statements from Jose, Bonet, and Coloma—the three gate agents who were present during the altercation—and then interviewed Bonet and Coloma. *Id*. at ¶ 46; Doc. 88 at ¶ 2. (Jose was not available for an interview. Doc. 88 at ¶ 2.) Although their accounts differed in minor respects, all three corroborated Pinzon's claim that Boswell had threatened her. Doc. 82-3 at ¶¶ 47-50; Doc. 68-3 at p. 25 (Jose reporting that Boswell said, "I'm

5

not afraid to beat you down and get fired"); *id*. at p. 27 (Bonet reporting that after Pinzon walked away, Boswell "began ranting about how [Pinzon] should not mess with [Boswell] because she would hurt her"); *id*. at p. 29 (Coloma reporting that after Pinzon walked away, Boswell said "she would not be afr[ai]d to beat her down and get fired for it"). None of the witnesses corroborated Boswell's account of the altercation. Doc. 82-3 at ¶¶ 47-50; Doc. 68-3 at pp. 25, 27, 29.

Based on the written statements and interviews, Griffin concluded that Pinzon's complaint that Boswell threatened her with physical violence had been substantiated. Doc. 82-3 at ¶ 51. (Boswell's Local Rule 56.1(b)(3)(B) response disputes this fact, arguing that "Griffin could not [have] come to a substantiated decision" because the witnesses' statements differed from one another and with Pinzon's account on some details and did not corroborate Pinzon's claim that Boswell had made threatening hand gestures. *Ibid*. Boswell's disagreement with Griffin's conclusion, however, does not undermine Envoy's assertion that Griffin reached that conclusion based on the information gathered in her investigation. Because Envoy's assertion is supported by the cited portions of the record and is not controverted by the materials Boswell cites in response, it is deemed admitted.) Griffin believed that Boswell's conduct violated Envoy's Work Environment Policy. *Ibid*.

Griffin closed her investigation on June 24, 2016. *Id*. at ¶ 52. That same day, Griffin learned that Boswell had been caught sleeping on the job the day before. *Id*. at ¶ 53. On June 23, 2016, lead agent Jamshed Khan emailed a manager to report that he found Boswell sleeping in a wheelchair on a jet bridge long after she was supposed to have returned from her lunch break. *Id*. at ¶ 54; Doc. 68-3 at p. 45. Khan stated that Boswell began her break at 5:40 p.m. but did not reappear, that he tried to contact her by radio from 6:30 to 7:00 p.m., and

6

that he ultimately found her asleep on the jet bridge. Doc. 82-3 at ¶ 54; Doc. 68-3 at p. 45. Boswell admitted in an email that she was asleep on the jet bridge past the end of her break but disputed the timeline, contending that Khan found her only fifteen minutes after she should have returned to work. Doc. 82-3 at ¶ 55; Doc. 68-3 at p. 47. Griffin determined that there was no need for any further investigation because Boswell had admitted to conduct that violated Rule 15 of the Envoy Rules of Conduct, which prohibits "[l]oafing, sleeping on the job, or intentional restriction of output." Doc. 82-3 at ¶¶ 56-57 (quoting Doc. 68-3 at p. 37, ¶ 15).

Griffin decided to terminate Boswell's employment. *Id*. at ¶ 58. The record is unclear as to whether Griffin reached that decision before or after learning that Boswell had been caught sleeping on the job. *Ibid*.; Doc. 88 at ¶¶ 15-16; *compare* Doc. 68-3 at p. 6, ¶ 28 (Griffin averring that she "had not yet determined whether Ms. Boswell's employment would be terminated" when she learned of the sleeping incident), *with* Doc. 82-9 at 62 (Griffin testifying that "the determination for termination was made on June 24th and the case was closed," and that "a note was put in after the closing to indicate sleeping while on … duty"), *and id*. at 71 (Griffin testifying that at the time she learned about the sleeping incident, "the termination had not been carried out in the process of putting together logistics for the termination"). In any event, Griffin knew about both incidents by the time she drafted Boswell's termination letter and cited both as grounds for termination. Doc. 82-3 at ¶¶ 59, 62; Doc. 68-1 at 133.

On June 29, 2016, Boswell was terminated and given the termination letter. Doc. 82-3 at ¶ 59. The letter stated that Boswell was being terminated because she violated Envoy's Rules of Conduct by sleeping on the job in violation of Rule 15 and by threatening Pinzon in violation of Rules 24 and 32. *Id*. at ¶ 62; Doc. 68-1 at 133. As noted, Rule 15 prohibits "[l]oafing, sleeping on the job or intentional restriction of output." Doc. 68-3 at p. 37, ¶ 15. Rule 24 instructs

7

employees to "[c]onsider the welfare of the Company and your fellow employees" and prohibits any "act that is detrimental to either." *Id*. at p. 38, ¶ 24. Rule 32 states in pertinent part:

> Behavior that violates the Company's Work Environment Policy, even if intended as a joke, is absolutely prohibited and will be grounds for severe corrective action, up to and including termination of employment. This includes but is not limited to, threatening, intimidating, interfering with, or abusive, demeaning or violent behavior toward, another employee, … while either on or off duty.

*Id*. at p. 38, ¶ 32. The Rules of Conduct warn that "[v]iolations of any of the Envoy Rules of Conduct … could be grounds for immediate termination depending on the severity of the incident or offense and the employee's record." *Id*. at pp. 38-39.

Boswell admits that her "sole factual basis" for believing that she was terminated due to her race "is the fact that neither Pinzon nor the witnesses to the incident are African-American." Doc. 82-3 at ¶ 69. Boswell is unaware of any Envoy employee who was found to have threatened physical violence in the workplace, or who was caught sleeping on the job, but who was not terminated as a result. *Id*. at ¶¶ 74-75, 77. Boswell also believes that the termination was in retaliation for her complaint about Murray and Rivera because both were in communication with Griffin about her investigation into the altercation between Boswell and Pinzon. *Id*. at ¶ 72; Doc. 82-7 at 10, 12, 16, 30-36.

Although Boswell asserts in her response brief that Envoy treated "Caucasian females who are over-weight" more favorably than it treated her as "an African-American female," she does not support her assertion with a citation to any specific paragraph in her Local Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement or even to any record material. Doc. 82-2 at 7 (citing "Pl. 56.1(b) ¶¶"). That violates Local Rule 56.1, so Boswell's assertion will be disregarded. *See Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664-66 (N.D. Ill. 2015). In any event, Boswell's assertion not supported by any part of her Local

8

Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement, providing an alternative ground for disregarding it. *See Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011) (noting that it "is certainly within a district court's prerogative" to decline to consider "any facts that were not contained in the parties' Rule 56.1 statements"); *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court"); *Dunhill Asset Servs. III, LLC v. Tinberg*, 2012 WL 3028334, at *3 (N.D. Ill. July 23, 2012) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (internal quotation marks omitted); *see also* N.D. Ill. L.R. 56.1(b)(3)(C) (requiring "references to the affidavits, parts of the record, and other supporting materials relied upon" to support factual assertions on summary judgment).

The court will not excuse Boswell's violation of Local Rule 56.1. Envoy served Boswell with a Local Rule 56.2 Notice, Doc. 71, which explained in detail the requirements of Local Rule 56.1. And under settled precedent, Boswell's *pro se* status does not excuse her from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though [the plaintiff] is a pro se litigant.") (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

**Discussion**

As noted, Boswell alleges that Envoy violated Title VII and § 1981 by denying her a promotion and ultimately terminating her due to her race and color and in retaliation for complaining to the human resources department about discrimination. The Seventh Circuit "generally use[s] the same standard to review discrimination and retaliation claims under § 1981 and Title VII." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017); *see also Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016) ("We analyze Title VII and § 1981 claims under the same framework."). For convenience's sake, therefore, the court will principally draw on Title VII case law when evaluating Boswell's claims. *See Montgomery v. DePaul Univ.*, 2012 WL 3903784, at *8 (N.D. Ill. Sept. 7, 2012) (citing cases).

Title VII's discrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)).

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, considered as a whole, would allow a reasonable juror to find that her protected characteristic or activity caused an adverse employment action. To meet that burden, the plaintiff may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 765-66. The *McDonnell Douglas* framework allows a plaintiff to forestall

summary judgment if she makes a *prima facie* case of discrimination or retaliation—by adducing evidence showing that she belonged to a protected class or engaged in protected conduct, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class or who did not engage in protected conduct and who were treated better—provided that the defendant fails to articulate a reasonable alternative explanation for the adverse action or the plaintiff shows that the proffered alternative explanation is a pretext. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). That framework is just one way the record can enable a reasonable juror to find discrimination or retaliation. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation marks omitted). A court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether "a reasonable factfinder [could] conclude that … [a] proscribed factor caused the … adverse employment action." *Ortiz*, 834 F.3d at 765.

The parties refer to both the *McDonnell Douglas* framework and the general causation standard in their briefs. Doc. 67 at 10-11; Doc. 82-2 at 5-8. The court therefore will "begin [its] assessment of the evidence by employing [the *McDonnell Douglas*] construct and addressing first whether [Boswell] has established" a genuine dispute under that framework. *David*, 846 F.3d at 224. If Boswell fails to do so, the court will then "assess cumulatively all the evidence" on which she relies "to determine whether it permits a reasonable factfinder to determine" that Envoy took an adverse employment action against her because of her race or color or in

retaliation for protected activity. *Ibid.*; *see also Karriem v. GSA*, 2018 WL 6179089, at *4 (N.D. Ill. Nov. 27, 2018).

I.     **Title VII and § 1981 Race and Color Discrimination Claims**

   A.     **Termination**

Boswell alleges that she was terminated because of her race or color, in violation of Title VII and § 1981. Doc. 82-2 at 1-3; Doc. 14 at ¶¶ 9, 12. Boswell cannot forestall summary judgment on that claim under the *McDonnell Douglas* framework because, even if she has presented a *prima facie* case, no reasonable juror could conclude on the summary judgment record that Envoy's legitimate, nondiscriminatory reasons for the termination were pretextual.

Envoy's termination letter offered two reasons for the termination: (1) Griffin's conclusion that Boswell threatened a fellow employee with physical violence; and (2) Boswell's admission that she was sleeping on a jet bridge while on duty. Doc. 82-3 at ¶¶ 58-59, 62; Doc. 68-1 at 133. Those reasons are plainly legitimate and nondiscriminatory. *See Abdel-Ghaffar v. Ill. Tool Works Inc.*, 706 F. App'x 871, 876 (7th Cir. 2017) (holding that the plaintiff's disrespectful emails, "missed deadlines, failure to keep regular hours, and sleeping on the job" were each legitimate, nondiscriminatory reasons supporting termination); *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506-07 (7th Cir. 2014) (holding that coworkers' reports that the plaintiff "intimidated or threatened" them provided a legitimate, nondiscriminatory reason for termination); *Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1297, 1299-1300 (7th Cir. 1992) (holding that the plaintiff's sleeping on the job provided a legitimate, nondiscriminatory reason for termination). To meet her burden of showing that those grounds for terminating her are pretextual, Boswell "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [Envoy's] asserted reasons that a reasonable person could find them unworthy of credence." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (alterations and

internal quotation marks omitted). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alteration and internal quotation marks omitted), *overruled in other part by Ortiz*, 834 F.3d at 764-65.

Boswell points to no record evidence from which a reasonable juror could find that Envoy was dishonest in determining that she had threatened a coworker or had been sleeping on the job, or in citing those incidents as grounds for termination. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715-16 (7th Cir. 2017) (holding that the defendant was entitled to summary judgment where the plaintiff did not "cite any evidence that would allow for a reasonable inference that [his employer] did not have honest concerns about his communication style and behavior"). Boswell's disagreement with Khan about *how long* she was sleeping on the job, Doc. 82-3 at ¶¶ 54-55; Doc. 68-3 at pp. 45, 47, does not change the fact that she admitted to sleeping on the job. And Boswell's critiques of Griffin's investigation of her altercation with Pinzon—that Griffin reviewed Jose's written statement but did not interview her in person, and that Griffin believed Pinzon's account of the altercation despite minor inconsistencies among the witnesses' recollections—do not support the conclusion that Griffin did not "honestly believe[]" that Boswell had threatened Pinzon or the conclusion that Griffin conducted a "sham investigation." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 863-65 (7th Cir. 2015) (affirming summary judgment where the plaintiff "dispute[d] the investigators' reasoning" and "raised some doubts about his guilt," but failed to adduce evidence from which a reasonable juror could find that his employer "did not actually believe the findings of the investigation," that the "investigation was a sham," or that "the relevant decisionmakers … did not legitimately rely on

13

the investigators' conclusions in terminating him") (internal quotation marks omitted). Boswell therefore cannot show that either of Envoy's stated reasons for terminating her was pretextual.

Even if Griffin decided to terminate Boswell before learning that she had been sleeping on the job—and even if citing the sleeping incident in the termination letter could be considered pretextual rather than a means of icing the cake—Boswell still could not prevail. To survive summary judgment, Boswell must "raise an issue as to pretext for *each* proffered" reason for her termination. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015) (emphasis added); *see also Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 659 (7th Cir. 2009) ("[W]hen a defendant has offered multiple nondiscriminatory reasons for its hiring decision, showing that one of these reasons is pretextual is not enough.") (alterations and internal quotation marks omitted). Accordingly, Boswell's failure to establish that a reasonable juror could find that Griffin's conclusion that she threatened Pinzon was a pretext for terminating her dooms her effort to forestall summary judgment on her discriminatory termination claim under *McDonnell Douglas*.

For substantially the same reasons, Boswell's termination claim fares no better when the evidence is assessed cumulatively, without the aid of the *McDonnell Douglas* framework, for Boswell adduces no evidence from which a reasonable juror could find that her termination had anything to do with her race or color. Indeed, Boswell acknowledges that her "sole factual basis" for believing that she was terminated because of her race or color is that "neither Pinzon nor the witnesses to the incident are African-American." Doc. 82-3 at ¶ 69. That is not enough to raise an inference that race or color was the reason for Envoy's decision. *See Skiba*, 884 F.3d at 725-26 ("Plaintiff merely points to the fact that he is American while his … supervisors … were Canadian. This fact, standing alone, does nothing to advance plaintiff's [Title VII national

origin discrimination claim]."). What the record *does* show is that Envoy, after receiving complaints that Boswell threatened a coworker with physical violence and that she was found sleeping on the job, conducted an investigation, found the complaints substantiated, and decided that her misconduct warranted termination. Doc. 82-3 at ¶¶ 40-41, 43-59, 62; Doc. 68-1 at 133; Doc. 68-3 at pp. 21, 45. Nothing in the record discredits that explanation. On this record, no reasonable juror could find that Envoy terminated Boswell because of her race or color.

### B. Denial of Acting Lead Designation

Boswell also claims that she was subjected to adverse employment action because of her race or color when Envoy denied her request to be designated as an acting lead—a designation that she considers a promotion. Doc. 82-2 at 3, 6-7. As with her wrongful termination claim, the court will first consider whether Boswell can forestall summary judgment under the *McDonnell Douglas* framework and, if she cannot, will proceed to the general causation standard. *See David*, 846 F.3d at 224.

Boswell's inability to show that Envoy's legitimate, nondiscriminatory reason for not designating her as an acting lead was pretextual means that she cannot prevail under *McDonnell Douglas* even if she could make out a *prima facie* case. Envoy's stated reason for denying Boswell the acting lead designation—her supervisors' belief that she was not ready for additional responsibilities given her deficient performance in her existing role—is legitimate and nondiscriminatory. *See Skiba*, 884 F.3d at 724 (holding that the defendant's belief that the plaintiff "was not qualified for the positions at issue" was a legitimate, nondiscriminatory reason for refusing to hire him). Boswell cannot show that this explanation was pretextual because she points to no record evidence from which a reasonable juror could find that her supervisors did not honestly believe that her performance was deficient or that Envoy was dishonest in citing

those concerns as its reason for declining to make Boswell an acting lead. *See Lauth*, 863 F.3d at 715-16.

As with the termination claim, assessing the evidence cumulatively under the general causation standard leads to the same result for substantially the same reasons. Boswell adduces no evidence that race or color played any role in Envoy's decision to deny her request for an acting lead designation. Rather, the record shows that Envoy denied her request because her supervisors were concerned with her performance in her existing role and felt that she was not ready to be given additional responsibilities. Doc. 82-3 at ¶¶ 9-12. Nothing in the record discredits that explanation. Accordingly, no reasonable juror could find that Envoy discriminated against Boswell due to her race or color in denying her request.

### C. Hostile Work Environment

Boswell argues in her brief that she was subjected to a hostile work environment because of her race or color, in the form of "unwarranted criticisms," "racial innuendos," "disciplinary action," "different dietary standards," and the denial of her request for vendors' access. Doc. 82-2 at 4, 8 (internal quotation marks omitted). Title VII's anti-discrimination provision "encompasses the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment." *Lord*, 839 F.3d at 561 (internal quotation marks omitted). For Boswell's hostile work environment claim to survive summary judgment, she must show that: "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (internal quotation marks omitted).

Boswell's claim fails because, on this record, no reasonable juror could connect the conduct of which she complains to any protected characteristic. Boswell's brief mentions "racial

16

innuendos," Doc. 82-2 at 4, but there is no record evidence of any such conduct. *See Bunn v. FDIC ex rel. Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018) ("To overcome a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial.") (internal quotation marks omitted). Nor does the record contain evidence that any of the other alleged conduct was at all connected with Boswell's race or color. *See Orton-Bell v. Indiana*, 759 F.3d 768, 775 (7th Cir. 2014) ("[The plaintiff's] supervisors' insensitive and inattentive responses were callous mismanagement; but absent evidence that this inaction was based on her [protected characteristic], it did not violate Title VII."); *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of [a protected characteristic].") (alterations, citation, and internal quotation marks omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("[The plaintiff] has presented no evidence to show that [the alleged harassers'] treatment of her was based on her [protected characteristics]—she argues instead that the 'abusive conduct was purely personal.' This is fatal to her [hostile work environment] claim."). Accordingly, no reasonable juror could find that Boswell was subjected to a hostile work environment based on her race or color.

## II.     Title VII and § 1981 Retaliation Claim

Finally, Boswell contends that Envoy retaliated against her for complaining to human resources in January 2016 about the conversation in which Murray and Rivera allegedly told her (1) that she would receive vendors' access if she showed that she was serious about losing weight and (2) that she would be designated an acting lead if she used Rivera's sister's diet plan. Doc. 82-2 at 2, 6-7; Doc. 82-3 at ¶¶ 15-17. Envoy argues that Boswell's retaliation claim cannot

survive summary judgment because her complaint about Murray and Rivera was not statutorily protected activity. Doc. 67 at 19-20. Envoy is correct.

To succeed on her retaliation claim, Boswell "must show that [she] engaged in a statutorily protected activity." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016). A statutorily protected activity is

> more than simply a complaint about some situation at work, no matter how valid the complaint might be. To be protected under Title VII, [the plaintiff's] complaint must have indicated the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.

*Ibid*. (alteration and internal quotation marks omitted).

Boswell's January 2016 complaint about Murray and Rivera was not protected activity. True, she complained generally about discrimination by using the email subject line "Discrimination At The Workplace" and writing that she believed it was "a form of discrimination" for her to be denied the acting lead designation while coworkers with less seniority received the designation. Doc. 68-1 at 107-109; Doc. 82-3 at ¶ 21. But nothing in the record indicates that Boswell so much as mentioned race, color, or any other protected characteristic. Doc. 82-3 at ¶¶ 19-21; Doc. 68-1 at 107-109. To the contrary, Boswell's stated concerns were that the offer to be an acting lead in exchange for starting a particular diet "had nothing to do with the merits of her work performance," that coworkers with less seniority had jumped ahead of her to become acting leads, and that she was afraid she was about to be fired. Doc. 82-3 at ¶¶ 19-20; Doc. 68-1 at 107-109. Her "membership in a protected class, without anything more, is not enough to transform [her] general complaint about improper workplace practices into a complaint opposing race discrimination." *Cole*, 838 F.3d at 901.

Boswell therefore did not engage in statutorily protected activity.  *See Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) (holding that the plaintiff's grievance was not protected activity under Title VII because it "did not claim that what happened to her was due to race, color, national origin, sex, or religion") (alteration and internal quotation marks omitted); *Skiba*, 884 F.3d at 718 (holding that the plaintiff's emails complaining about his supervisor were not protected activity because they "[did] not reference" any protected classes "at all, either directly or indirectly," were "framed … in general terms" as a "personality conflict" with an "abusive" supervisor, and did not "suggest[] that [his supervisor] acted with unlawful discriminatory animus").  It follows that her retaliation claim cannot survive summary judgment.

## Conclusion

Envoy's summary judgment motion is granted.  Judgment will be entered in favor of Envoy and against Boswell.

December 31, 2018

United States District Judge